IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01483-REB-MEH

ELIZABETH WOJDACZ,

      Plaintiff,

v.

COLORADO SPRINGS CITY POLICE DEPARTMENT,
COMMANDER BRIAN GRADY,
OFFICER JOHN IRELAND,
PATRICK MILLER,
PENROSE ST. FRANCIS HEALTHCARE,
GARY LEE NORMAN,
MICHAEL J. DUNCAN, and
CLIFF HUDSON,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Pending before the Court is the City Defendants' Motion to Dismiss Amended Complaint or Quash Service [filed August 16, 2012; docket #23] filed by Defendants Commander Brian Grady, Officer John Ireland, and the Colorado Springs Police Department (collectively the "City Defendants"). Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. L.Civ.R 72.1.C, the motion is referred to this Court for recommendation. (Docket #26.) The matter is fully briefed, and the Court has determined that a *Trinity* hearing or oral argument would not materially assist its adjudication of the motion. (*See* docket #54.) For the reasons set forth below, the Court RECOMMENDS the motion be **granted in part** and **denied in part** as follows.

**BACKGROUND**

I.   **Facts**

The following are factual allegations (as opposed to legal conclusions, bare assertions or merely conclusory allegations) made by the Plaintiff (or construed liberally) in Plaintiff's Amended Complaint [docket #19], which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   The Court must limit its review to the four corners of the Amended Complaint.   *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001). In the interest of clarity, the Court has arranged the facts topically rather than chronologically.   After a brief background regarding Plaintiff and her relationship with Defendant Norman, the Court will describe Plaintiff's medical treatment with Defendant Penrose St. Francis ("Penrose"), the alleged incident of domestic violence between Plaintiff and Mr. Norman which precipitated the involvement of the City Defendants, the divorce proceedings between Plaintiff and Mr. Norman, and Plaintiff's state court lawsuit.

A.   Plaintiff and Mr. Norman

Plaintiff moved to Colorado from Ohio in July 2000.   (Docket #19 at ¶ 13.)   On or about March 1, 2002, Plaintiff registered a trade name for her construction company, which she incorporated on March 15, 2003.   (*Id*. at ¶¶ 14-15.)   Two years later, in March 2005, Plaintiff met Defendant Gary Norman.   (*Id*. at ¶ 16.)   Plaintiff and Mr. Norman entered into a common law marriage the following May.   (*Id*. at ¶ 17.)   Unbeknownst to Plaintiff, Mr. Norman was married to another woman at the time.   (*Id*. at ¶ 17.)   Additionally, Mr. Norman had a somewhat extensive criminal history involving a series of arrests for illegal drugs, weapons, and various traffic offenses.

2

(*Id*. at ¶¶ 2-12.)

Sometime prior to March 2007, Defendant Norman enlisted Defendant Cliff Hudson to prepare Norman's tax returns. (*Id*. at ¶ 26.) According to Plaintiff, Mr. Norman's illegal activities generated a portion of the funds in Mr. Norman's sole account at the time of the 2007 tax preparation. (*Id*.) On or about March 2007, Mr. Norman, with the assistance of Mr. Hudson, asked Plaintiff to sign various tax documents that Plaintiff believes misrepresented her income for the 2006 tax year. (*Id*. at ¶ 18-21.) As a result, Mr. Norman received an excessive tax refund on his 2006 income tax return. (*Id*. at ¶ 22.) Plaintiff alleges that Mr. Norman committed similar tax fraud in 2007, 2008, and 2009, with the help of Mr. Hudson. (*Id*. at ¶¶ 27-40.)

By July 2010, Plaintiff alleges that Defendant Norman had amassed more than $100,000.00 from his tax activities with Mr. Hudson. (*Id*. at ¶ 48.) Mr. Norman used a portion of this money to purchase property in Pueblo, Colorado ("the Property") in July 2010. (*Id*. at ¶ 49.) As part of the transaction, Mr. Norman paid $2,175.00 to Patrick Muldoon for the preparation of documents associated with the sale. (*Id*. at ¶ 51.) Shortly after the purchase, Mr. Norman paid Chad Pulsifer of Rocky Mountain Pole Barn, Inc. over $10,000.00 to erect a pole barn on the Property. (*Id*. at ¶¶ 59, 60.) Mr. Norman then incorporated Plaintiff's name on the deed of the Property, which Plaintiff and Mr. Norman held as "Joint Tennants (sic) with Rights of Survivorship" and as husband and wife. (*Id*. at ¶ 61.)

In December 2010, Mr. Pulsifer approached Plaintiff about performing some additional driveway work on the Property. (*Id*. at ¶ 62.) Mr. Pulsifer represented that he and Mr. Norman had agreed to the work in advance and offered to extend them a line of credit. (*Id*.) Plaintiff refused, and Mr. Pulsifer did not perform the extra work. (*Id*.)

B.    Plaintiff's Medical Treatment

Beginning on January 19, 2011, Plaintiff began receiving medical treatment for a heart condition from Defendant Patrick Miller, MD.  (*Id*. at ¶ 70.)  Plaintiff alleges that Defendant Norman scheduled her initial appointment and advised Dr. Miller to wait until Plaintiff could obtain health insurance before performing a follow up examination.  (*Id*. at ¶¶ 70- 71.)  Several days later, Mr. Norman attempted to force Plaintiff to sign up for indigent care by attacking her in the couple's bedroom and threatening to abandon her.  (*Id*. at ¶ 72.)  Plaintiff claims this incident caused her to suffer a mild heart attack.  (*Id*. at ¶ 73.)

Plaintiff returned to Dr. Miller for additional medical treatment on March 2, 2011, at which time Dr. Miller prescribed blood pressure medication and performed a PHQ-9 test.  (*Id*. at ¶ 75.)  On March 8, 2011, in response to Plaintiff's complaints that the medication was not working, Dr. Miller advised Plaintiff to double her dosage.  (*Id*. at ¶ 76.)  Several weeks later, on March 31, 2011, Plaintiff went to the emergency room because of a reaction she had to the blood pressure medication.  (*Id*. at ¶ 77.)  Dr. Miller met with Plaintiff the next day and prescribed her a new medication.  (*Id*. at ¶ 78.)  Plaintiff made two more trips to the emergency room regarding similar complications on April 3, 2011, and May 8, 2011.  (*Id*. at ¶ 135-36.)  Her hospital bills for the three emergency room visits total $6,779.23.  (*Id*. at ¶ 137.)  Over the next month and a half, Dr. Miller canceled several appointments with Plaintiff before terminating her as a patient on May 19, 2011.  (*Id*. at ¶ 79.)  Plaintiff alleges that Mr. Norman paid for one of Plaintiff's appointments with Dr. Miller using proceeds from his unlawful tax activities.  (*Id*. at ¶ 80.)

Plaintiff returned to the emergency room again on August 24, 2011.  (*Id*. at ¶ 138.)  During her August 2011 visit, Plaintiff alleges that an employee of Defendant Penrose attempted to force

Plaintiff to sign application for indigent care that contained false information.  (*Id*. at ¶ 139.) Plaintiff made several subsequent trips to the Penrose emergency room on September 29, 2011, March 10, 2012, and May 29, 2012, for complications related to her heart condition.  (*Id*. at ¶¶ 140-42.)  Plaintiff estimates the cost of these visits was approximately $30,000.00.  (*Id*. at ¶ 144.) Plaintiff believes her medical records contain false information, and that Penrose deprived her of proper medical care until "she agreed to sign up for Indigent Care."  (*Id*. at ¶¶ 145-46.)

      C.    <u>Domestic Violence Allegations</u>

On January 21, 2011, at approximately 3:00 a.m., Plaintiff went to the Colorado Springs Police Department ("the CSPD") to report the above-described physical altercation between herself and Defendant Norman.  (*Id*. at ¶ 158.)  Defendant Ireland responded to the call and met with Plaintiff in the lobby to discuss the incident.  (*Id*. at ¶ 158-59.)  Officer Ireland left the station shortly thereafter to speak with Mr. Norman at the Property.  (*Id*. at ¶ 160.)  Plaintiff waited in the lobby for approximately 30 minutes until the desk clerk instructed her to meet Officer Ireland at the Property so she could unlock the door.  (*Id*. at ¶¶ 161-62.)  Upon her arrival, Officer Ireland told Plaintiff she was required to let him into the house so he could investigate the incident.  (*Id*. at ¶ 163.)

Once in the home, Officer Ireland discovered two of the three guns owned by Plaintiff and Defendant Norman.  (*Id*. at ¶ 164.)  He then suggested that Plaintiff obtain a restraining order against Mr. Norman and that she sell items of "marital property" located in the backyard.  (*Id*. at ¶¶ 165-66.) Though Mr. Norman was not home at the time of Officer Ireland's investigation, Mr. Norman later told Officer Ireland that "he meant well."  (*Id*. at ¶ 167.)  Plaintiff was not interested in the police arresting Mr. Norman at that time.  (*Id*. at ¶ 168.)

Following the January 21, 2011 incident, Plaintiff had no contact with Officer Ireland until

December 29, 2011.  (*Id*. at ¶ 169.)  At that time, Plaintiff "explained about the racketeering acts" so that Officer Ireland could amend his initial report.  (*Id*.)  When Officer Ireland refuse to amend his report, Plaintiff became suspicious that the CSPD was also engaged in racketeering.  (*Id*.)

In January 2012, Plaintiff met with Defendant Grady "concerning the conduct of several officers." (*Id*. at ¶ 170.)  In a later meeting, Officer Grady provided Plaintiff with a medical release so that he could obtain her medical records for purposes of prosecuting Mr. Norman for the January 11, 2011 assault.  (*Id*. at ¶ 172.)  Plaintiff provided a limited release, but discovered in February 2012, that her medical records were not forwarded to the District Attorney's office. (*Id*. at ¶ 174.)

Plaintiff alleges that her efforts to report racketeering to the CSPD were not properly documented.  (*Id*. at ¶ 176-77.)  In particular, she alleges that Officer Ireland's description of events creates the impression that Plaintiff has memory problems and "is mentally flawed."  (*Id*. at ¶ 178.)  Plaintiff further alleges that the CSPD and Defendants Grady and Ireland knew of and failed to investigate tax fraud, racketeering, forgery, theft, money laundering, and a murder related to Plaintiff's divorce proceeding.  (*Id*. at ¶ 179.)

     D.    <u>Divorce Proceedings and Relations with Mr. Norman</u>

Around the time of the alleged domestic violence incident in January 2011, Defendant Norman hired Defendant Michael Duncan to be his attorney in divorce proceedings.  (*Id*. at ¶¶ 88-89.)  Mr. Duncan prepared dissolution papers, but did not specify the nature of the "irretrievable" differences between Plaintiff and Mr. Norman.  (*Id*. at ¶ 91.)  Additionally, Mr. Duncan mailed Plaintiff between 250 and 1000 court documents. (*Id*. at ¶ 94.)  Plaintiff believes Mr. Norman paid Mr. Duncan "large undisclosed amounts of money" from the same bank account Mr. Norman used to pay Defendant Miller.  (*Id*. at ¶ 93.)

During the divorce proceedings, Plaintiff alleges Defendant Norman threatened to "throw her in a mental hospital" if she testified at their July 18, 2011 divorce hearing. (*Id*. at ¶ 104.) As a result of these threats, Plaintiff elected not to attend the divorce hearing. (*Id.* at ¶ 105.) Plaintiff's appeal of the divorce proceedings remains pending before the Colorado Court of Appeals. (*Id*. at ¶ 113.) Pursuant to a letter dated January 24, 2012, Plaintiff was or is currently being investigated by the Colorado Supreme Court. (*Id*. at ¶¶ 114-15.)

On August 16, 2011, while Plaintiff's divorce appeal remained pending, Defendant Duncan filed an "Ex Parte Replevin action" with the intent of removing Plaintiff from the Property. (*Id*. at ¶ 117.) In October 2011, Mr. Pulsifer sent subcontractors to perform work on the Property without Plaintiff's consent. (*Id*. at ¶ 119.) Two months later, in December 2011, Judge McHenry ordered Plaintiff's name be removed from the deed to the Property. (*Id*. at ¶¶ 122, 126.)

A month prior to the termination of Plaintiff's property rights, Defendant Norman approached Plaintiff in a parking lot and asked her to meet him at the Property and then to follow him to a restaurant for dinner. (*Id*. at ¶ 120.) When Plaintiff attempted to follow him as planned, Mr. Norman sought a restraining order against her for stalking. (*Id*. at ¶ 121.) Mr. Norman's permanent restraining order against Plaintiff became effective on November 22, 2011. (*Id*. at ¶ 125.)

E.    Plaintiff's State Civil Action

In addition to the legal proceedings described above, Plaintiff initiated a civil action in El Paso County District Court against Defendants Norman, Duncan, and Hudson, as well as Judge McHenry and an individual identified as "Feeney" on July 18, 2011. (*Id*. at ¶ 116.) As a result of Plaintiff's claims, the Attorney General filed a motion requesting attorney's fees in the amount of $4,396.00. (*Id*. at ¶ 123.) At the time of the motion, Plaintiff had not yet been terminated from the

deed to the Property, and thus, Plaintiff requested the court issue a lien against the Property for the amount of the fees.  (*Id*. at ¶ 124.)

## II.      Procedural History

Plaintiff initiated this action on June 7, 2012, and filed an Amended Complaint on August August 2, 2012.  (Dockets ##1, 19.)  In addition to the City Defendants, Plaintiff names Dr. Patrick Miller, Penrose, Gary Norman, Michael Duncan, and Cliff Hudson as Defendants.   Though Plaintiff's allegations are numerous, she asserts three distinct claims for relief: (1)   alleged racketeering activities under the Colorado Organized Crime Control Act, Colo. Rev. Stat. 18-17-104 ("COCCA") against all Defendants jointly and severally; (2) alleged violations of her First, Fourth, and/or Fourteenth Amendment rights against the City Defendants and Defendants Norman and Duncan; and (3) alleged malpractice against Defendants Miller and Penrose.  (Docket #19 at 30.)

In response to Plaintiff's Amended Complaint, the City Defendants filed the pending Motion to Dismiss Amended Complaint or Quash Service [docket #23] ("the City Defendants' Motion to Dismiss").   The City Defendants' Motion to Dismiss argues, among other points, that the Court lacks jurisdiction to hear Plaintiff's claims against the City Defendants because the City Defendants are entitled to immunity under the Colorado Governmental Immunity Act ("CGIA"). Relying on the CGIA, the City Defendants cite two bases for immunity.  First, the City Defendants contend that the CGIA does not waive immunity for alleged violations of COCCA; thus, Plaintiff's COCCA claims against them should be dismissed.  Second, they argue that the CGIA bars any tort claim against Defendant Ireland because Plaintiff has failed to file notice of a claim within the 180-day period required by the CGIA.  On this point, they note that Plaintiff's contact with Defendant Ireland

occurred on January 21, 2011, but Plaintiff did not file her notice of claim until February 10, 2012.

In addition to asserting immunity, the City Defendants argue that Plaintiff has failed to allege specific facts that would support a claim for conspiracy against the City Defendants. Likewise, the City Defendants contend that Plaintiff's Section 1983 claims arising from the alleged violation of her First, Fourth, and Fourteenth Amendment rights are completely conclusory and lacking in factual support. With respect to Plaintiff's claims against the CSPD, the City Defendants argue that the CSPD must be dismissed from this action because it is not a legal entity subject to suit. Preemptively, the City Defendants argue that the Court should deny Plaintiff an opportunity to amend her complaint to add a claim against the City of Colorado Springs for municipal liability because Plaintiff has failed to set forth any facts or allegations showing that a custom or policy of the municipality caused the alleged constitutional violations. In addition to these specific issues, the City Defendants also argue more generally that Plaintiff lacks standing to sue because she has not identified any injury caused by her contact with the City Defendants. Finally, the City Defendants ask the Court to quash service as ineffective.[1]

Plaintiff disputes the City Defendants' assertion that her notice of claim was untimely. Instead, she argues that she did not discover facts supporting her racketeering claim until December 29, 2011. Plaintiff contends the Court should use that date rather than the date of her contact with Defendant Ireland to determine the deadline for filing a notice of claim under the CGIA. Plaintiff also argues that failure to waive immunity for COCCA violations would render certain portions of the CGIA unconstitutional. Toward that end, Plaintiff filed a constitutional challenge regarding the

---

[1]Plaintiff has since corrected the service errors and the City Defendants, through their counsel, have conceded that service is adequate. Thus, this portion of the City Defendants' Motion to Dismiss is moot.

City Defendants' assertion that the CGIA bars liability for COCCA violations. (Docket #52.) The Clerk of the Court certified the filing of Plaintiff's constitutional challenge to the Colorado Attorney General on September 11, 2012. (Docket #53.) Pursuant to Fed. R. Civ. P. 5.1(c) and Fed. R. Civ. P. 6(a)(1)(C), the 60-day period within which the Attorney General was permitted to intervene expired on November 13, 2012. Because the Attorney General did not attempt to intervene, the Court may consider the constitutional question, to the extent it is presented, on the merits. *See* Fed. R. Civ. P. 5.1(c).

Following the City Defendants' Motion to Dismiss, Plaintiff also filed a motion asking the Court to hold a *Trinity* hearing regarding the immunity issue. Because the CGIA does not shield the City Defendants from liability for constitutional violations and the City Defendants have not sought immunity on this basis, the Court noted it must limit its consideration of the asserted immunity to Plaintiff's COCCA claim. Ultimately, the Court found that Plaintiff's ability to sue the City Defendants under COCCA depends on whether the CGIA applies to COCCA claims, whether the legislature has waived immunity on this basis, and whether any failure to waive immunity is constitutional. Because these are legal questions and Plaintiff failed to identify any preliminary issues of fact, the Court determined that a *Trinity* hearing was not necessary.

## STANDARDS OF REVIEW

### I.      Dismissal Under Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are

courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  A court lacking jurisdiction "must dismiss the cause *at any stage* of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (emphasis in original).  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *See Basso*, 495 F.2d at 909. Accordingly, Plaintiff in this case bears the burden of establishing that this Court has jurisdiction to hear her claims.  Further, under a 12(b)(1) motion, "a court has 'wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)).  In such an instance, "a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion." *Id.*

## II.    Dismissal under Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

The Rule 12(b)(6) evaluation requires two prongs of analysis.  First, the Court identifies "the

allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 1949–51. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 1951. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 1950. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1949.

The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## III.   Dismissal of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite

the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)). A dismissal "without affording the plaintiff notice or an opportunity to amend is proper only 'when it is patently obvious that plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.'" *Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001) (quoting *Hall*, 935 F.2d at 1110 (additional quotation marks omitted)).

## DISCUSSION

As noted above, the City Defendants seek dismissal on several grounds. Though the City Defendants urge the Court to resolve the immunity question first under Fed. R. Civ. P. 12(b)(1), the Court declines to do so for several reasons. First, Plaintiff's COCCA claim against the City Defendants is so lacking in factual support that the Court is unable to determine whether it falls within the scope of the CGIA.[2] *See Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008) (instructing courts to assess whether a claim is covered by the CGIA "on a case-by-

---

[2]The same is true with respect to standing. As Judge Blackburn has observed, a plaintiff must meet certain requirements to have standing under COCCA. *See The Arc of the Pikes Peak Region v. National Mentor Holdings, Inc.*, 10-cv-01144-REB-BNB, 2011 WL 1047081, at *2 (D. Colo. March 18, 2011) (citations and quotations omitted) ("To have standing to bring a COCCA claim, a plaintiff must allege that he or she has been injured by the conduct constituting the COCCA violation.") Under this standard, "a plaintiff can recover only for harm caused by one or more predicate acts." *Id.* Because Plaintiff's Amended Complaint provides no factual basis for a COCCA claim, the Court believes it is best to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(6).

case basis through a close examination of the pleadings and undisputed evidence."). The inquiry is further complicated by the lack of any apparent precedent from either the Colorado Supreme Court or the Colorado Court of Appeals regarding the CGIA's applicability to COCCA claims. *See Glover v. State*, 129 P.3d 1083 (Colo. App. 2005) (declining to consider whether the CGIA provides immunity against COCCA claims: "[b]ecause we conclude the trial court properly dismissed the case for failure to exhaust administrative remedies, we need not consider the other grounds raised by defendants or addressed by the court."). Plaintiff's constitutional challenge to the CGIA provides the Court with additional incentive to avoid the question, if possible. *See Sorenson Commc'n, Inc. v. F.C.C.*, 567 F.3d 1215, 1220 (10th Cir. 2009) (citations and internal quotations omitted) ("It is a fundamental rule of judicial restraint for courts, prior to reaching any constitutional questions, to consider nonconstitutional grounds for a decision."). In this case, it is neither necessary nor prudent to reach the immunity question under Fed. R. Civ. P. 12(b)(1) because dismissal of the COCCA claim is warranted on other grounds. Therefore, the Court will begin by analyzing the adequacy of Plaintiff's claims against the City Defendants under Fed. R. Civ. P. 12(b)(6). Thereafter, the Court will examine whether Plaintiff may assert any claims against the CSPD and whether Plaintiff should be given an opportunity to further amend her pleading.

## I.      Adequacy of Plaintiff's Claims Under Fed. R. Civ. P. 12(b)(6)

### A.      <u>COCCA Claim</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff asserting a COCCA claim must allege at least two acts of racketeering activity which are related to the conduct of the enterprise. *See Clementson v. Countrywide Fin. Corp.*, 464 F. App'x 706, 713-14

(10th Cir. 2012) (upholding district court's dismissal of a *pro se* plaintiff's COCCA claim under Fed. R. Civ. P. 12(b)(6) where plaintiff failed to allege two acts of racketeering activity).  As defined by Colo. Rev. Stat. § 18-17-103(5), "racketeering activity" means to commit or attempt to commit, or to solicit, coerce, or intimidate another person to commit any of the offenses listed in subsections 18-17-103(5)(a)-(b) of the Act.

Plaintiff's claims against the City Defendants arise from Plaintiff's interactions with various officers following a domestic dispute with Defendant Norman in January 2011.  In particular, Plaintiff alleges that Defendant Ireland accompanied her to her residence on January 21, 2011, and searched her home without her permission.  Officer Ireland allegedly advised Plaintiff to obtain a restraining order against Mr. Norman and to sell some items of "marital property" located in her backyard.  Plaintiff does not allege any further contact with the City Defendants until December 2011, when Plaintiff attempted to report Mr. Norman to police for racketeering.  When Officer Ireland did not amend his January police report to include Plaintiff's suspicions, Plaintiff began suspecting the City Defendants were also involved in the conspiracy.  Plaintiff attempted to report the alleged conspiracy to Defendant Grady, who claimed he would forward the information to the District Attorney. According to Plaintiff, he failed to do so.  In addition to be ignored by several officers, Plaintiff also claims that police reports concerning the alleged racketeering contain false information.

From these facts, it appears Plaintiff has confused the City Defendants' alleged failure to investigate the reported racketeering activities of Defendant Norman and others with the City Defendants' commission, solicitation, or coercion of the same. Though the list of qualifying criminal activities is extensive, the Court sees nothing in Plaintiff's Amended Complaint, beyond

Plaintiff's conclusory labels, that would provide support for even one predicate act of racketeering on the part of the City Defendants. Therefore, the Court recommends the District Court dismiss Plaintiff's COCCA claim against the City Defendants.

B.    Constitutional Claims

Plaintiff's second claim for relief alleges violations of her First, Fourth and/or Fourteenth Amendment rights against the City Defendants.  Construing Plaintiff's Amended Complaint liberally, the Court will consider whether Plaintiff has pleaded sufficient facts to support a plausible claim for relief under any of the constitutional theories she asserts.

i.    *First Amendment*

The First Amendment protects a spectrum of rights ranging from religious expression to free speech.  In this case, it is unclear to the Court which particular aspect of the First Amendment Plaintiff believes the City Defendants violated.  However, based on the nature of Plaintiff's interactions with the City Defendants as described in Plaintiff's Amended Complaint, namely Plaintiff's alleged attempts to report racketeering activities to the City Defendants, the Court construes the pleading liberally to allege retaliation.

The Tenth Circuit has adopted a three-part test which requires plaintiffs alleging retaliation to show:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).  The City Defendants did not appear to anticipate this

construction of Plaintiff's Amended Complaint, and thus, do not address any of the elements of *Shero*. Notably, neither did Plaintiff. Nonetheless, the Court finds that Plaintiff's attempts to report the alleged racketeering activities of others constitutes protected speech in satisfaction of the first element. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (finding that speech calculated to disclose misconduct is protected by the First Amendment). However, the Court struggles to find any facts in Plaintiff's Amended Complaint that would satisfy either the second or third elements of the test. With respect to the second element, Plaintiff has failed to identify any specific adverse action on the part of the City Defendants that would chill a person of ordinary firmness from continuing to engage in protected speech. The fact that the City Defendants refused to investigate Plaintiff's claims or even take them seriously does not qualify as an adverse action. Simply put, Plaintiff's right to speak does not create a corresponding obligation for government officials to listen. *See Minnesota State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) ("A person's right to speak is not infringed when government simply ignores that person while listening to others.").

Even under a liberal construction of Plaintiff's Amended Complaint, the Court finds no basis for a First Amendment claim against the City Defendants. Therefore, the Court recommends that any such claim be dismissed.

### ii.   Fourth Amendment

Given the dearth of context for Plaintiff's Fourth Amendment claim, the Court is left to infer from the conduct described in the Amended Complaint that Plaintiff seeks redress for the search of her residence on January 21, 2011, by Defendant Ireland. According to Plaintiff, Officer Ireland traveled to Plaintiff's residence to investigate Plaintiff's claim of domestic violence. At his request,

Plaintiff met him at the residence shortly after his arrival. Plaintiff alleges that Officer Ireland told her "she was required to let him into the house to investigate the scene." (Docket #19 at ¶ 163.) Upon searching the home, Officer Ireland allegedly found two of the three guns owned by Plaintiff and her husband. Thereafter, Officer Ireland advised Plaintiff to obtain a restraining order.

The Supreme Court has consistently held that warrantless searches and seizures in a home violate the Fourth Amendment absent consent or exigent circumstances. *Steagald v. United States*, 451 U.S. 204, 211-12 (1981). Although police may enter a home over the objection of a lawful resident to protect a victim of domestic violence, they may not search the home for evidence of a crime merely because they suspect domestic violence may have occurred. *See Georgia v. Randolph*, 547 U.S. 103, 118-19 (2006).

In this case, there is no indication from either party that Defendant Ireland had a warrant to search Plaintiff's residence. To the contrary, it appears Officer Ireland gained access to Plaintiff's home by suggesting that Plaintiff had no alternative. Plaintiff's agreement to open the door, under the circumstances alleged, does not constitute valid consent. *See Florida v. Bostick*, 501 U.S. 429, 435 (indicating that consent to search is not valid where police "convey a message that compliance with their requests is required."). Finally, it does not appear from the facts that there were any exigent circumstances necessitating a warrantless search of the residence. Notably, Plaintiff was outside of the home and the alleged perpetrator, Defendant Norman, appeared to be away. (*See* docket #19 at ¶¶ 162, 167.)

Based on the facts alleged, the Court finds that Plaintiff has stated a claim for relief under the Fourth Amendment against Defendant Ireland based on his search of her residence on January 21, 2011. However, there is nothing in Plaintiff's Amended Complaint to implicate any of the other

City Defendants in the search.  Because personal participation is required under Section 1983, the Court recommends Plaintiff's Fourth Amendment claim against Defendant Grady be dismissed.  *See Iqbal*, 129 S. Ct. at 1948.  The Court will address the viability of Plaintiff's claim against the CSPD below.

### iii.    Fourteenth Amendment

From the face of the Amended Complaint, it is unclear to the Court whether Plaintiff asserts a due process or equal protection claim.  Candidly, the Court sees no factual basis for either. Because it is not the province of the Court to construct a legal theory out of thin air, the Court considers Plaintiff's reliance on the Fourteenth Amendment only insofar as it extends the protections of the   First and Fourth Amendments against state actors.  The Court recommends that any independent Fourteenth Amendment claim against the City Defendants be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    Claims Against The CSPD

The City Defendants argue that Plaintiff's claims against the CSPD are not viable because the CSPD is not a legal entity that may be sued.  Plaintiff counters that a police department may be sued under  18 U.S.C. § 1962.

The Tenth Circuit has held that city police departments are not separate suable entities. *See Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985) (dismissing claims against the "City of Denver Police Department" because it is not an entity subject to suit).  The same holds true for the CSPD.  *See Boren v. City of Colorado Springs*, 624 F. Supp. 474, 479 (D. Colo. 1985).  Although the Court agrees that a city police department may be considered an "enterprise" within the meaning the Racketeer Influenced and Corrupt Organizations Act, the cases cited by Plaintiff do not stand

for the proposition that a city police department may be subject to suit on that basis. *See United States v. Kovic*, 684 F.2d 512, 516 (7th Cir. 1982); *see also United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988). Unlike the instant case, *Kovic* and *Friedman* were criminal actions brought by the United States against an individual defendants. Plaintiff's citation to such cases does not persuade the Court that the CSPD may be sued in a civil action under COCCA or Section 1983. Therefore, the Court recommends that the CSPD be dismissed from this lawsuit.

## III.     Leave to Amend

Dismissal of a case under Fed. R. Civ. P. 12(b)(6) is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading while protecting the interests of justice. *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1359 (10th Cir. 1989). As such, in this jurisdiction, the Court typically does not dismiss a claim under Rule 12(b)(6) until the plaintiff has been provided notice and an opportunity to amend the complaint to cure the defective allegations. *See Bellmon*, 935 F.2d at 1109-10.

In this case, the Court notes that Plaintiff has previously amended her pleadings in response to a motion to dismiss filed by the City Defendants. (*See* dockets ##10, 19.) In this way, Plaintiff has already received notice of potential deficiencies and an opportunity to cure them. *See Bellmon*, 935 F.2d at 1109-10. Additionally, the glaring absence of information in Plaintiff's Amended Complaint regarding the City Defendants leads the Court to find that further amendment would be futile. Consequently, the Court recommends that the Plaintiff be denied another opportunity to amend her pleadings to assert additional claims against the City Defendants.

## CONCLUSION

For the reasons described above, the Court finds that Plaintiff's Amended Complaint fails

to allege sufficient facts to support a claim for relief against the City Defendants under either COCCA or the First Amendment. However, the conduct described in Plaintiff's Amended Complaint does support a claim under the Fourth Amendment against Officer Ireland based on his alleged entry into Plaintiff's home without a warrant or valid consent. The remaining City Defendants should be dismissed from this action entirely. Accordingly, the Court recommends that City Defendants' Motion to Dismiss Amended Complaint or Quash Service [filed August 16, 2012; docket #23] be **granted in part** and **denied in part** as stated herein, and that the District Court deny Plaintiff any further opportunity to amend her pleadings.

Dated this 3rd day of January, 2013, in Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge